**U–HAUL INTERNATIONAL, INC., an Oregon corporation, Plaintiff,**

v.

**JARTRAN, INC., a Florida corporation; Jar Corporation, a Florida corporation; James A. Ryder, an individual; and Sandra C. Tinsley, Inc., Defendants.**

**No. CIV 80–454 PHX–EHC.**

United States District Court,
D. Arizona.

Nov. 26, 1984.

Dan M. Durrant, Streich, Lang, Weeks & Cardon, Phoenix, Ariz., for plaintiff.

## MEMORANDUM AND ORDER

CARROLL, District Judge.

This action was filed by U-Haul International, Inc. (U-Haul), June 16, 1980, seeking to enjoin continued publication of certain advertisements by Jartran, Inc. (Jartran) as well as recovery of damages claimed to result from that advertising program.*

The application for preliminary injunction was heard in December, 1980 and January, 1981. The Court's Order, entered February 17, 1981, granting a preliminary injunction is reported in *U-Haul Intern., Inc. v. Jartran, Inc.*, 522 F.Supp. 1238 (D.Ariz. 1981).

Jartran appealed the February 17, 1981 order, attacking the Court's findings that the ads at issue in the preliminary injunction proceeding were false and deceptive as well as challenging the Court's ruling that the Lanham Act, Section 43(a), 15 U.S.C. § 1125(a), was not limited in its application to "palming off" one's goods or services as the product of another. The Court of Appeals for the Ninth Circuit affirmed, *U-Haul Int'l, Inc. v. Jartran*, 681 F.2d 1159 (1982):

> ... It would not support the goals of the Act to hold the kind of deception Jartran practiced in its advertising not actionable under section 43(a). *Id.* 681

F.2d at 1162.

The matter came on for trial on February 24, 1983.** The parties waived a jury on the day of trial. The trial extended for nineteen days, with more than three thousand two hundred pages of testimony. Seventy persons testified personally or by way of deposition. Over two hundred exhibits were admitted, consisting of countless thousands of pages.

Pursuant to Fed.R.Civ.R. 65(a)(2), evidence received during the extensive preliminary injunction hearing, which was admissible upon the trial of the merits, is a part of the trial record.

Post-trial briefs, together with proposed findings of fact and conclusions of law, were filed with the Court. The matter has been under advisement since mid-June, 1983.

*Preliminary Discussion:*

The February 17, 1981 Memorandum Opinion, granting the preliminary injunction outlines the nature of the proceedings, the status of the parties, and gives a general background of how the controversy developed. The opinion also sets forth the Court's findings with respect to a series of Jartran ads comparing its equipment, either directly or by explicit inference, with that of U-Haul.

Trial issues also involved a series of price comparison ads with U-Haul which Jartran had run prior to the equipment comparison ads. As noted in the preliminary injunction order, the character of these ads was reserved until time of trial.

The third trial issue, and the most troublesome to the Court, concerned the extent of damages which U-Haul sustained if Jartran's advertising programs were found violative of the Lanham Act or common law claims of unfair competition and disparagement.

For the reasons noted later in this Order, the findings and conclusions set forth in the Memorandum Opinion of February 17, 1981, and incorporated as a part of this Order, I reach similar findings and conclusions regarding the price comparison ads, and conclude that U-Haul was substantially damaged by those advertising activities.

My ultimate findings and conclusions may be summarized as follows:

In 1978, James A. Ryder terminated his relationship with Ryder System, an entity he founded and controlled for many years. In the mid-1970s, Ryder System brought

---

* Additional defendants included Jar Corporation (JAR), James A. Ryder (Ryder) and Sandra C. Tinsley, Inc., (Tinsley), Jartran's Advertising Agency.

** Jartran's Chapter 11 bankruptcy proceedings filed in the Northern District of Illinois in December, 1981 did not materially delay pretrial preparation, since the automatic stay as to this case was lifted effective April 30, 1982.

in new management and Ryder was largely being ignored. In 1978, although he was then 60+, he terminated his relationship with Ryder System, and concluded to start another company which would be competitive with some of the services provided by Ryder System. This new entity was first called Jarpool and later evolved into Jartran and JAR Corporation. The JAR in these various corporate titles was to identify and establish the presence of James A. Ryder.

Jartran's first activities involved leasing large truck and trailer units to commercial enterprises. Growth was limited and Ryder determined to expand the company into the self-move rental business. Jartran's new scope of operations would bring it into direct competition with U-Haul, the longtime leader—or sole occupant—of that industry.

Jartran at the time of incorporation, had limited financing, minimal corporate organization, and little equipment. Through Ryder's efforts, Jartran survived its premature birth and was able to arrange the acquisition of trucks and then trailers, through creative deficit financing. It obtained its equipment, most of it located in Detroit, Michigan, from Dodge and Ford (trucks) and Fruehauf (trailers). These manufacturers not only provided equipment for Jartran, but did so with a "financing package of 110 percent, sometimes 115", i.e., equipment plus cash or credit to Jartran.

Jartran was faced with an immediate practical and financial problem—how to get these prospective rental units from Detroit to dealers or rental centers throughout the United States. At the same time, Jartran was also making arrangements for a dealer-distribution network. This effort largely consisted of hiring former Ryder System and U-Haul executives to head up the dealer-distribution program.

It was estimated to cost about $8,000,-000.00 to move these units from Detroit to rental outlets. Someone in the Jartran organization proposed that this distribution effort could be incorporated in an advertising campaign, such that persons would rent the equipment at Detroit and move it throughout the United States. Such an advertising program had several beneficial aspects:

It would get the equipment out of Detroit, and to ultimate market areas;

It would place Jartran before the self-move public as an immediate and full-born competitor of U-Haul;

It would enable Jartran to dramatically and repetitively image itself on a nationwide basis as a new—other—provider of self-movement equipment, safer and more attractive, and substantially less expensive to rent than U-Haul;

It would provide immediate cash flow to Jartran necessary to its financial survival. Jartran had monthly equipment payments totaling $3,500,000.

Was this effort successful? Consider the early record of Jartran's consumer rental division:

Within a period of weeks, Jartran ads appeared on a national basis. Over 2,000 ads were published between mid-1979 and the end of 1980;

Equipment was rented in Detroit and driven or towed to market areas throughout the United States;

Gross revenues (rounded) rose from $3,000,000 in 1979, to $58,000,000 in 1980, and $95,000,000 in 1981;

Advertising expenses in 1980 totaled approximately $6,000,000;

Mr. Ryder publicly announced that the campaign "knocked the competition [U-Haul] on their ass."

Jartran and its agency sought and was awarded national recognition by the advertising industry for the "overall marketing effectiveness of [its] campaign."

An advertising campaign—of the type utilized by Jartran—has a life-beyond-publication. Its message remains in the public mind and can influence consumer decisions long after the newspaper is consigned to the trash bin.

What was the effect of all this on U-Haul?

In 1979, U-Haul had almost all of the self-move, household goods trailer rental business nationwide and about 60% of the same type of truck rental business. The Company had experienced the entry of competition over the years in both facets of its business without any measurable loss of revenues. Its largest competition in 1979 was Ryder System.

U-Haul had a steady and measurable annual growth in revenues prior to 1980. The self-move rental business is not adversely affected by general business recessions. Rentals increase during a recessionary period as families relocate to seek new job opportunities. Businesses rent rather than purchase new equipment for local moves during times of economic downturns.

In the mid–1970s U-Haul's equipment distribution procedures started to change. The availability of independent dealers was impacted by a number of factors, including closing of independent gas stations or conversion to company operated outlets. U-Haul increased its utilization of centralized equipment facilities, called self-moving centers, with some increase in its operating costs.

Equipment safety, rental cost and convenience of equipment availability are important considerations to a renter of self-move equipment.

U-Haul's record of gross revenue growth decreased substantially as Jartran became an active competitor and media advertiser. In fiscal 1981 U-Haul experienced its first downturn in gross revenues over those of a prior fiscal year.

U-Haul's gross revenue for fiscal year 1981 was approximately $49,000,000 less than it forecasted for that prior to the time it knew Jartran was to be a competitor.

Pre-Jartran, U-Haul had done little print media advertising. Its principal advertising efforts had utilized the yellow pages in telephone directories. U-Haul expended approximately $13,600,000 in print media advertising costs in 1981 and 1982 in an effort to counteract Jartran's advertising which is at issue in this proceeding.

In 1979–80, U-Haul had been in the self-move industry for more than thirty years. It had experienced the entry of a new competitor on a number of occasions. U-Haul's gross revenues had not been adversely affected by this added competition. While U-Haul had less market share over a period of time, its revenues and number of transactions continued to increase as competitors such as E-Z Haul and Ryder System entered the market.

The situation with Jartran was markedly different. In a period of months Jartran secured more than a 10% share of the market for both trucks and trailers.

It is impossible to separate the effect of Jartran's entry into the market from the effects of its advertising program. Suffice it to say that Jartran, without the character of its ad program directed at U-Haul, would not have attained the market shares for trucks and trailers within the period of time that it did.

Before being called to task through this proceeding, Jartran executives boasted that "Newspaper advertising has made us the fastest growing company in America" and that "In less than two years time, Jartran has shaken up the truck rental industry with overnight identity, moving to No. 3 in the nation in rentals."

Jartran's claim that no damages should be awarded to U-Haul falls on deaf ears. To embrace this position would be to reward a commercial privateer and encourage further predatory advertising practices in the business world.

The judgment in this case will advise Jartran as to the practical cost for the advertising program directed against U-Haul. To that extent, Jartran, James A. Ryder, and others similarly motivated, will know that financial expediency or the desire for instant substantial market share affords no immunity for violations of the Lanham Act or common law claims of disparagement and unfair competition.

The damage award of $20,000,000, while a substantial dollar amount, is minimal under the evidence. Professor Jack Winders, a credible expert economist, testified that minimal lost revenues for fiscal 1981 totaled $30,000,000 for one-way rentals. Allowing 25% for incremental costs related to these added revenues provides a net damage figure of $22,500,000 for this one class of services.

I would arrive at the same damage award by allowing U-Haul its advertising costs of $13,600,000, and awarding it the $6,000,000 expended by Jartran to carry out the offending ad campaign.

With the foregoing general discussion in mind, the Court enters further findings of fact and conclusions of law as follows:

## FINDINGS OF FACT

1. Plaintiff U-Haul International, Inc. (U-Haul) is an Oregon corporation with its principal place of business in Phoenix, Arizona. U-Haul performs accounting, clearinghouse and other functions for entities and individuals that have common interests in marketing and renting trucks, trailers and related equipment, on both a local and one-way basis, to consumers for household moving. These entities and individuals, together with U-Haul, will be referred to as the U-Haul System. One-way rentals constitute the largest segment of the self-move consumer rental business.

2. The trademark "U-Haul" is registered with the United States Patent and Trademark Office.

3. AMERCO, a Nevada corporation, wholly owns and is the parent corporation of U-Haul and of each of various separately incorporated rental companies, which do business under the name and style "U-Haul" (U-Haul Rental Companies).

4. Trucks and trailers are owned by fleet owners (U-Haul Fleet Owners). The U-Haul Fleet Owners enter into contracts with U-Haul, which contracts obligate U-Haul to provide for the rental of the fleet owners' equipment. U-Haul, in turn, contractually authorizes the rental companies to provide for the rental of trucks and trailers to the public.

5. The U-Haul Rental Companies enter into "U-Haul Dealership Contracts" with independent dealer-agents (U-Haul Rental Dealers). Operating under these contracts, U-Haul Rental Dealers display and rent trucks and trailers to the public on both a one-way and local basis. Some of the U-Haul rental companies operate U-Haul moving centers, which also, among other things, rent trucks and trailers to the public on both a local and one-way basis.

6. The U-Haul System has been offering trailers to consumers for local and one-way rentals since approximately 1945. U-Haul System has been offering trucks for consumer rental for household moving purposes since approximately 1959.

7. On a national basis, immediately prior to 1979, the U-Haul System provided close to 100 percent of the trailers rented in one-way consumer trailer rental transactions. On a national basis, immediately prior to 1979, U-Haul System provided at least 60 percent of the trucks rented in one-way truck rental transactions.

8. Defendant Jartran, Inc. (Jartran) is a Florida corporation and at relevant times had its principal place of business in Florida.

9. Defendant James A. Ryder (Ryder) is a resident and citizen of the State of Florida who, with others, incorporated Jartran in late 1978. From its incorporation through at least the end of 1980, Ryder owned, either directly or indirectly, at least 85 percent of the outstanding stock of Jartran.

10. Jartran was significantly undercapitalized at the time of incorporation and remained so during relevant time periods to this action. The Company was dependent upon Ryder's credit and his making funds available to the Company. Ryder was required by sellers of equipment and lenders to personally guarantee obligations of the Company.

11. Ryder, either directly or indirectly through other corporations he controlled,

managed and controlled Jartran for his own personal benefit and advantage.

12. In mid–1979, beginning primarily in the Detroit area where a substantial portion of its rental truck fleet was acquired, Jartran began actively competing in the local and one-way consumer truck rental business. By some time in early 1980, its operations for trucks and trailers became nationwide.

13. Jartran offers its products and services in interstate commerce, throughout the continental United States, including the District of Arizona, and is in competition with the U-Haul System.

14. In the summer of 1979, Jartran initiated a program of national advertising. Jartran employed an advertising agency, Sandra C. Tinsley, Inc. (Tinsley) to assist it in this program. Advertisements placed by Tinsley on behalf of Jartran numbered over 2,000 and were published throughout the United States. These ads appeared over a period of 16 months.

15. Jartran started its advertising program with ads comparing one-way rental rates charged by U-Haul and Jartran. Most of these advertisements stated "U-Haul It to (City) ... Jartran It to (City) ..." with rates for U-Haul and Jartran stated after the name of the city. The advertising program began in the Detroit area in late June 1979, with Jartran's entry into the self-move equipment rental business. In November 1979, the area of Jartran's price comparison ad campaign was greatly expanded. Between November 1979 and May 1980, Jartran published over 900 comparative price ads in approximately 160 cities across the nation. This expanded campaign was characterized by ads which contained not only the earlier headline ("U-Haul It To ..."), but also representations that a rental customer could obtain the same substantial savings (as indicated in the headlined prices to the advertised destination) if he chose to rent to another destination. These later ads constitute the majority of the price comparison ads.

16. Jartran's advertised price to the advertised destination was a special promo-tional price which was not identified as such. This price was intended to convey and was in fact perceived by the relevant market as the price Jartran would normally charge and thus as representative of Jartran's overall pricing policy.

17. Jartran arrived at the advertised price for its equipment by selecting a promotional rate that would have consumer impact. This price, which was not disclosed as a promotional rate, was compared in ads with a U-Haul price. In numerous ads the U-Haul price used included a basic rate and a distribution fee. The ads did not disclose the fact that the U-Haul price included a distribution fee.

18. The self-move equipment rental industry imposes distribution fees as a temporary device to regulate rentals to areas in which there is a build-up of equipment.

19. The distribution fee is regularly quoted separately from the one-way rate in order to emphasize its temporary nature and so that the consumer will know it may not apply should he decide to delay his move.

20. Jartran knew that the Jartran and U-Haul policies of quoting a distribution fee separately from the one-way rate were identical.

21. Distribution fees apply to less than 5% of U-Haul's one-way transactions per year.

22. Jartran's advertised prices were lower than rates reflected on Jartran's standard one-way rate sheet for the same type of rental transaction to the same destination.

23. In a majority of Jartran transactions surveyed, rates charged exceeded the advertised rates.

24. The comparative claim "save big money ... to almost any city" was intended to convey that the rental customer would realize a similar savings, as illustrated by the differential between the two headlined prices, to generally every city. The relevant rental market perceived this intended message of substantial savings.

**1148**

25. During this period of price comparison advertisements, Jartran's company policy was to price above its competition; its rate structure was the same or slightly higher than that of U-Haul.

26. Jartran knew that U-Haul's prices as well as its own were subject to change at any time.

27. Jartran, through its corporate management who supervised the ad campaign and who were responsible for selecting the advertised prices was aware that U-Haul had a meeting-competition pricing policy.

28. Jartran's method of surveying rates being charged by U-Haul was haphazard and poorly structured.

29. Jartran had Tinsley publish an ad showing a Jartran truck and a U-Haul truck with the comparative sizes of the vehicles adjusted to make the U-Haul truck appear smaller and less attractive.

30. U-Haul and Jartran prices in the price comparison ads were false, deceptive, misleading and incomplete. Jartran's comparative claim, that Jartran could save the consumer big money to almost any city on truck and trailer rentals was false, deceptive and misleading.

31. The findings in the Memorandum and Order of February 17, 1981, regarding equipment comparative ads, are incorporated and made a part of this final order.

32. The false and deceptive statements in the Jartran ads actually deceived a substantial segment of renters of self-move equipment who relied upon the advertisements.

33. The consumer study conducted by Response Analysis Corporation (RAC) as well as consumer studies undertaken by Field Research Corporation (FRC) and by Behavior Research Corporation (BRC) were each performed in accordance with advertising industry standards and were objective, reliable and probative of the beliefs engendered by the Jartran ads in the minds of the relevant public.

34. The false and deceptive statements contained in the Jartran ads were material in influencing rental decisions of a substantial segment of the public interested in renting self-move equipment.

35. Jartran ads in late 1980, which did not directly name U-Haul, were designed to and were in fact perceived by a substantial segment of the buying public as constituting comparative claims to U-Haul.

36. Jartran advertisements had substantial carryover effect in the mind of the interested public after the date of publication.

37. In September 1979, U-Haul prepared a financial forecast of fiscal 1981 gross rental revenues, equipment and support rental items, distribution fees and self-move insurance premiums which was in the amount of $412,000,000 for the United States.

38. Actual operations of the U-Haul System during fiscal year 1981 for the United States resulted in gross rental revenues of $363,045,000.

39. There is a demonstrated relationship between Jartran's advertising and U-Haul's failure to realize its forecasted gross revenues for fiscal year 1981. Jartran's false advertising was a material cause of U-Haul's injury.

40. The difference between U-Haul's forecasted gross revenues for fiscal year 1981 and the revenues actually realized is not attributable to:

(a) changes in the number or location of its rental dealers;

(b) inventory of its equipment stationed in any area;

(c) Ryder System promotional advertising campaign;

(d) economic conditions.

41. It is impossible to separate the effect of Jartran's entry into the self-move market as a competitor from the effects of its advertising program.

42. Historically, U-Haul's gross revenues did not decline as a new competitor entered the self-move market. Additional competitors had the effect of expanding the market. The mere entry of Jartran as

a new competitor did not account for U-Haul's revenue shortfall in fiscal 1981.

43. U-Haul sustained damages for lost profits for fiscal year 1981 in an amount not less than $20,000,000.

44. U-Haul continued to sustain damages for lost profits for periods after fiscal year 1981.

45. U-Haul expended approximately $13,600,000 for media advertising designed to offset or counter the adverse effects of Jartran advertisements directed at U-Haul.

46. Jartran's 1979–1980 advertising campaign cost was approximately $6,000,-000.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction. 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a). *See U-Haul International, Inc. v. Jartran, Inc.,* 681 F.2d 1159 (9th Cir. 1982). The Court has jurisdiction over plaintiff's pendent claims. 28 U.S.C. § 1338(b); 28 U.S.C. § 1331.

2. Plaintiff U-Haul International, Inc. is a real party in interest and has standing to sue for damages sustained by itself and other entities comprising the U-Haul System.

3. Under the Lanham Act, a false representation of fact may be an actual false statement; an affirmatively misleading statement; a partially correct statement; a statement which is untrue as a result of a failure to disclose information; or a statement which is literally true but conveys a false impression through innuendo, indirect intimation or ambiguous suggestion which has a tendency to mislead or deceive the consumer.

█ 4. A false representation must be about Jartran's equipment, either standing alone or in comparison to U-Haul's equipment. The advertisement need not directly or explicitly compare U-Haul and Jartran to be a comparative advertisement. It is sufficient that a substantial segment of the buying public understands that the ad compares the equipment of the two competitors.

█ 5. Consumer reliance as an element of a claim for damages under Section 43(a) of the Lanham Act, can be shown by direct evidence such as testimony from individual members of the buying public, or by circumstantial evidence, such as surveys of the buying public.

█ 6. In this case the buying public for purposes of the actual deception/reliance requirement of the Lanham Act consists of those persons who have been in the market to move or who are planning to move in the near future.

█ 7. To prove actual deception of the buying public, plaintiff in this case need only show by competent surveys that the number of members of the buying public who are deceived, is not insignificant.

8. The target market respondents in the FRC and BRC reports (all adults) and in the RAC report (those who had moved over the last three years or who were planning to move over the next 12 months) demonstrate significant levels of actual consumer deception and reliance on the Jartran advertisements at issue. The FRC and BRC reports and the RAC consumer perception surveys are probative of both the issues of likelihood of deception of the buying public for purposes of permanent injunctive relief as well as actual deception of the buying public for purposes of plaintiff's claim for damages.

9. The number of consumers in the prospective market group who were influenced by each of the claims in issue made in the disputed advertisements was sufficiently substantial to conclude that the claims were material for purposes of plaintiff's Section 43(a) and common law claims.

█ 10. Publication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance. Defendants have not rebutted this presumption.

█ 11. Jartran is liable to plaintiff under Section 43(a) of the Lanham Act because the advertisements at issue (1) con-

tain false, misleading, deceptive and incomplete statements of fact; (2) which statements are likely to deceive and actually did deceive a substantial segment of the buying public; (3) and which are material in that they are likely to and did influence the customer's choice of a self-move company; (4) because Jartran's goods and services travel in interstate commerce; and (5) the disputed advertisements actually injured U-Haul.

■ 12. The tort of unfair competition encompasses false, deceptive and misleading advertising. It is not limited to conduct involving "palming off" or "passing off."

■ 13. The same facts which lead to liability under Section 43(a) of the Lanham Act will support a claim under the tort of unfair competition.

14. Jartran is liable to plaintiff for unfair competition.

■ 15. Conduct which constitutes disparagement is actionable as unfair competition.

16. The elements of a disparagement claim as set forth in *Restatement (Second) of Torts* §§ 623A, 626 and 629 (1976) are followed by Arizona courts.

■ 17. The causation element of a disparagement claim is met where the evidence establishes that the disparaging statements were a substantial factor in causing pecuniary loss. Plaintiff need not prove loss of specific customers.

■ 18. The First Amendment does not protect commercial speech which exceeds the bounds of truthful advertising.

19. Plaintiff is not required to prove actual malice with convincing clarity.

■ 20. Jartran's disparaging statements are not privileged. The statements constitute false assertions of specific unfavorable facts regarding U-Haul's prices and equipment.

21. Jartran is liable to plaintiff for disparagement:

(a) The statements referred to the plaintiff by name or the public knew that the statements referred to the plaintiff, and the

(b) statements disparaged the plaintiff or its product.

22. Jartran's false advertising was a material cause of U-Haul's loss of gross revenues, and consequent loss of profits, in fiscal year 1981.

23. Plaintiff is not required, in order to sustain a damage claim under the facts of this proceeding, to segregate the effects of Jartran's entry into the market from the effects of its false and misleading advertisements.

■ 24. In Lanham Act and similar common law cases, as well as antitrust cases, the plaintiff is not required to prove the amount of damages with mathematical certainty.

■ 25. In determining lost profits from lost revenues, taxes on the income U-Haul would have realized are not deducted.

■ 26. Under the Lanham Act claim, a Court may award additional damages, up to three times the amount awarded for actual damages "according to the circumstances of the case." 15 U.S.C. § 1117. The circumstances of this case make such an award proper. U-Haul has sustained damages above and beyond those actually awarded. Additional damages are appropriate in the amount of $20,000,000.

27. With respect to the claim for punitive damages based on U-Haul's common law claims, and with respect to the Lanham Act claim for additional damages pursuant to 15 U.S.C. § 1117, Jartran's conduct in relation to its advertising was willful, malicious or in reckless disregard of the rights of plaintiff. Punitive damages equal to the amount awarded under 15 U.S.C. § 1117 are appropriate. This award is alternative to the award under 15 U.S.C. § 1117.

28. Plaintiff's alter ego claim against Ryder is governed by Florida law.

■ 29. The determination that a corporation is the alter ego of its shareholder

does not require a showing of actual fraud on the part of the shareholder.

 30. It is fair and equitable that Ryder be found personally responsible for damages sustained by U-Haul as a result of Jartran's actions. There is no requirement that plaintiff prove that Ryder dominated Jartran's actions with respect to the claimed false and deceptive advertising; that Ryder organized Jartran in order to commit a wrongful or fraudulent purpose; or that Ryder's domination of Jartran was the proximate cause of plaintiff's injury.

31. U-Haul did not unreasonably delay instituting and prosecuting this action. U-Haul's activities in response to actions by Jartran do not preclude equitable relief.

32. The Tinsley settlement agreement and actions in accordance with the agreement do not constitute a waiver of U-Haul's claims against Jartran and James A. Ryder, the other defendants in this action. The agreement expressly reserved those rights to U-Haul.

33. Jartran and Ryder's liabilities to U-Haul are not dependent on the liability of Tinsley.

 34. The buying public has been and will continue to be deceived as to the prices and relative characteristics of U-Haul and Jartran equipment and that this deception has injured, is injuring, and will continue to injure, U-Haul's reputation and goodwill among consumers. U-Haul is entitled to a permanent injunction restraining Jartran, its agents, servants, officers and all those in privity with it from publishing the price comparison, equipment performance, or miles-per-gallon advertisements found to be false and deceptive in this proceeding.

35. This is an "exceptional case", within the provision of 15 U.S.C. § 1117, and Plaintiff is awarded reasonable attorney fees.

In the event any of the findings of fact or conclusions of law should more appropriately be considered as the other, they shall be so considered.

Accordingly,

IT IS ORDERED that the Clerk is directed to enter Judgment in favor of Plaintiff and against Defendants Jartran, Inc. and James A. Ryder, jointly and severally, in the amount of $40,000,000.

IT IS FURTHER ORDERED that Plaintiff recover reasonable attorney fees in an amount to be determined by the Court. Plaintiff shall file an application for reasonable attorney fees within ten days of the date of this Order. The application shall be verified and shall specify the services performed, the time involved for each service, the individual performing the service, and the hourly rate claimed for each individual. A response and reply shall be filed in accordance with Rule 11, Local Rules of Practice. An evidentiary hearing will be set if requested by Defendants.

IT IS FURTHER ORDERED that a permanent injunction shall issue forthwith in accordance with the foregoing Opinion.