DIAMOND COMPANY *v.*
GENTRY ACQUISITION CORPORATION,
INC. ET AL.

(No. 137875—Decided
February 25, 1988.)

Court of Common Pleas of
Cuyahoga County.

*Jeffrey H. Friedman* and *David M. Smith,* for plaintiff.

*Porter, Wright, Morris & Arthur* and *Kathleen McDonald O'Malley,* for defendants.

JAMES J. MCMONAGLE, J. On October 15, 1988, the plaintiff filed its "Verified Complaint for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction and Damages." The defendants responded with an answer and counterclaim, but the issues addressed herein concern only the plaintiff's preliminary injunction request. The parties have been afforded a full evidentiary hearing and the matter has been fully briefed.

Although Civ. R. 65 does not specifically set forth the standards for the issuance of injunctive relief, the following guidelines are appropriate for a court to consider:

(1) The likelihood or probability of the movant's success on the merits;

(2) Whether the movant has an adequate remedy at law;

(3) Will the issuance of the preliminary injunction prevent the claimed irreparable injury;

(4) What injury to the parties and others will be caused by the granting of the preliminary injunction;

(5) The public interest that will be served by the granting of the injunctive relief; and

(6) Whether the injunctive relief sought is for the purpose of maintaining the status quo pending trial on the merits. See *Mason Cty. Medical Assn.* v. *Knebel* (C.A. 6, 1977), 563 F. 2d 256, 261; *In re DeLorean Motor Co.* (C.A. 6, 1985), 755 F. 2d 1223, 1228; *North Avondale Neighborhood Assn.* v. *Cincinnati Metro. Housing Auth.* (C.A. 6, 1972), 464 F. 2d 486, 488; *Crews* v. *Radio 1330, Inc.* (N.D. Ohio 1977), 435 F. Supp. 1002, 1005; *Dodd* v. *Rue* (C.P. 1979), 64 Ohio Misc. 21, 15 O.O. 3d 196, 411 N.E. 2d 201; Fed. R. Civ. P. 65.

Because of the potentially harmful nature of preliminary injunctive relief when weighed against its purpose to "protect * * * an effective judgment on the merits" and its function to serve "as a means of preserving the court's ability to grant effective, meaningful relief after a determination of the merits," *Gobel* v. *Laing* (1967), 12 Ohio App. 2d 93, 94, 41 O.O. 2d 175, 176, 231 N.E. 2d 341, 342, the plaintiff is required to show by "clear and convincing evidence" its entitlement to this claimed relief, *Southern Ohio Bank* v. *Southern Ohio Savings Assn.* (1976), 51 Ohio App. 2d 67, 69, 5 O.O. 3d 183, 184, 366 N.E. 2d 296, 298. That burden of proof has been defined as "a degree of evidence required in a special type of civil case that is less than the degree required in a criminal case but more than that required in an ordinary civil action. * * *" *Household Finance Corp.* v. *Altenberg* (1966), 5 Ohio St. 2d 190, 193, 34 O.O. 2d 348, 349, 214 N.E. 2d 667, 670.

The plaintiff claims the defendants' advertising has the effect of "duping the unsuspecting public into purchasing goods which are not of the quality or standard of which they have been advertised" and this violates the Ohio Deceptive Trade Practices Act, *e.g.,* R.C. 4165.02, the pertinent part of which provides as follows:

"A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

"* * *

"(E) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

"* * *

"(G) Represents that goods or services are of a particular standard, quality or grade, or that goods are of a

particular style or model, if they are of another;

"* * *

"(J) Makes false statements of facts concerning the reasons for, existence of, or amounts of price reductions[.]"

R.C. 4165.03 permits a private cause of action, even though, in commercial advertising, the public always benefits:

"A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage or loss o[f] profits is not required. * * *"

The plaintiff has asked this court to enjoin the defendants from continuing their present advertising scheme so that it can recover what it is already entitled to — a market free of false advertising. See *Johnson & Johnson* v. *Carter-Wallace, Inc.* (C.A. 2, 1980), 631 F. 2d 186, 192.

The plaintiff, the Diamond Company ("Diamond"), is engaged in the men's retail clothing business and operates approximately twenty-five men's clothing stores in and around Cleveland, Akron, Columbus and Toledo, Ohio and Erie, Pennsylvania. Twenty-two of these stores are best described as "regular-priced men's stores" and three are categorized as "discount-clothing stores."

Defendant Gentry Acquisition Corp., Inc. ("Gentry") began its business in Cincinnati approximately fifteen years ago and now has gross sales in the area of $30,000,000. Gentry first opened a store in the Cleveland market in March 1986 in Willoughby Hills, Ohio and subsequently opened another outlet on the west side of Cleveland. Gentry now has eight stores competing in the markets of Cincinnati, Columbus and Cleveland, Ohio, Indianapolis, Indiana and Chicago, Illinois, in addition to the affiliated stores that it has in New York, New Jersey and Connecticut. The Cincinnati corporate offices retain tight control over all business affairs and all stores receive an even distribution of merchandise, which permits a common advertising scheme coordinated by and initiated from the corporate headquarters.

Plaintiff's proof centers upon advertisements contained in a March 1986 flyer used by Gentry to introduce its Willoughby Hills store, an October 1, 1987 Cleveland Plain Dealer advertisement and an October 9, 1987 Cleveland Jewish News advertisement. Typical of the claimed misleading and false advertising are the following:

"Now Cleveland men, too, can save *about half* at Gentry on men's top-quality clothing from the world's outstanding makers and designers." (Emphasis added.)

"We invite you to accept our gift of a wardrobe of three pure silk designer ties of your own choice — many handmade in Italy and England — valued at about $25.00 each."

"To protect our fine sources, we never, EVER, advertise our brand names, though you will see the expensive labels in much of our clothing."

"*How can we do it?* By buying in tremendous quantities — by buying seasonal production overruns from our carefully selected sources — sometimes by underwriting a manufacturer's entire off-season production — we get the best makers' best clothing for below normal original wholesale. And sell it, usually, for about *half* of what you'll pay for the identical fabrics, fashions and tailoring quality in the regular-priced stores and departments." (Emphasis added.)

"*And you still save about half of everything,* compared to prices for the

identical clothing in the best regular-priced department and specialty stores." (Emphasis added.)

"*Classic, Button-down Oxford dress shirts* with the label of America's most-respected traditional shirtmaker. 100% cotton or durable cotton/poly. *Elsewhere, $28.00* at Gentry: $16.00." (Emphasis added.)

"*Over 6,000 superior-quality, famous maker and designer suits * * *.* Classic, traditional and sophisticated Italian styles in the finest year-round weight of 100% wool worsteds and time-honored, press-holding, light-weight Dacron worsteds. *You'll see many of the identical suits selling elsewhere for $275.00 to $355.00.* At Gentry, mostly: $145.00 and $155.00." (Emphasis added.)

Gentry admits the above-quoted advertisements are typical of those placed by it, but specifically denies that any of the statements contained therein are untrue, false or deceptive.

Initially, Gentry asserts that the plaintiff has the burden of presenting sufficient evidence for this court to determine that the speech at issue is not entitled to a constitutional protection and further that there is no less intrusive method other than an injunction by which the plaintiff can be protected from the alleged harm.

The United States Supreme Court has held that speech of any type, to be protected, does not necessarily have to involve an expression of ideas. *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council* (1976), 425 U.S. 748, 761-762. Both parties in this case have the freedom to engage in commercial speech in the form of advertising and this right is protected by the First Amendment to the United States Constitution and Section 11, Article I of the Ohio Constitution. See, *e.g., Zauderer* v. *Office of Disciplinary Counsel* (1985), 471 U.S. 626; *Norton Outdoor Advertising,*

*Inc.* v. *Arlington Heights* (1982), 69 Ohio St. 2d 539, 23 O.O. 3d 462, 433 N.E. 2d 198; and *Cleveland Heights* v. *Lindsay* (1979), 65 Ohio App. 2d 215, 19 O.O. 3d 162, 417 N.E. 2d 1019. Courts are not permitted to invade commercial free speech and grant injunctions which have the effect of being a prior restraint unless there is a clear showing that the speech is unworthy of constitutional protection and that the only remedy is a narrowly drawn injunction.

In *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Counsel, supra,* at 770 and 771-772, the court provided examples of the type of governmental regulations of commercial speech that would still be permissible:

"* * * Untruthful speech, commercial or otherwise, has never been protected for its own sake. * * * Obviously, most commercial speech is not provably false, or even wholly false, but only deceptive and misleading. We foresee no obstacle to a State's dealing effectively with this problem. [Footnote deleted.] The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely. * * *"

In footnote 24 to the *Virginia* opinion, the court elaborated on its holding:

"In concluding that commercial speech enjoys First Amendment protection, we have not held that it is wholly undifferentiable from other forms. There are commonsense differences between speech that does 'no more than propose a commercial transaction,' [citation omitted], and other varieties. Even if the differences do not justify the conclusion that commercial speech is valueless, and thus subject to complete suppression by the State, they nonetheless suggest that a different degree of protection is

necessary to insure that the flow of truthful and legitimate commercial information is unimpaired. * * *" *Id.* at 771-772.

Simply stated, there is no blanket protection for all commercial speech: "* * * [W]e * *´* have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Ohralik* v. *Ohio State Bar Assn.* (1978), 436 U.S. 447, 456.

The Ohio Supreme Court also has specifically refused to recognize a blanket, plenary protection for commercial speech. In *O'Brien* v. *Univ. Community Tenants Union* (1975), 42 Ohio St. 2d 242, 245, 71 O.O. 2d 223, 225, 327 N.E. 2d 753, 755, the court recognized that there are cases which permit prior restraint, for "[o]nce speech has judicially been found libelous, if all the requirements for injunctive relief are met, an injunction for restraint of continued publication of that same speech may be proper" (emphasis deleted), citing *Curtis Publishing Co.* v. *Butts* (1967), 388 U.S. 130.

Therefore, the First Amendment does not prohibit this court from considering the merits of plaintiff's request to preliminarily enjoin claimed false or misleading advertising.

The pleadings, evidence, arguments and briefs frame the issues in terms of a violation of the Ohio Deceptive Trade Practices Act (R.C. 4165.01 *et seq.*).

In determining whether an individual or entity has violated the Ohio Deceptive Trade Practices Act, Ohio courts often look at the Lanham Act, *e.g.,* Section 1125(a), Title 15, U.S. Code, which is substantially tracked by our statute. *Cesare* v. *Work* (1987), 36 Ohio App. 3d 26, 28, 520 N.E. 2d 586, 590; *Jewel Companies, Inc.* v. *Westhall Co.* (N.D. Ohio 1976), 413 F. Supp. 994, 999, affirmed (C.A. 6, 1978), 575 F. 2d 1176. The generally required proofs on a claim of false or deceptive advertising are:

(a) a false statement, or a statement which is misleading;

(b) which statement has actually deceived or has the tendency to deceive a substantial segment of the target audience;

(c) the deception is material in that it is likely to influence a purchasing decision; and

(d) the plaintiff has been or is likely to be injured as a result. *American Rockwool, Inc.* v. *Owens-Corning Fiberglas Corp.* (E.D.N.C. 1986), 640 F. Supp. 1411, 1439. See, also, *Skil Corp.* v. *Rockwell Internatl. Corp.* (N.D. Ill. 1974), 375 F. Supp. 777, 783.

If a statement in an advertisement is facially false or is susceptible to an objective determination of its falsity, the only issues under the Lanham Act are questions of materiality, causation and damages. See *Coca-Cola Co.* v. *Tropicana Products, Inc.* (C.A. 2, 1982), 690 F. 2d 312, 317. If the challenged statement is not objectively or facially false, the plaintiff then has the burden of introducing some evidence that the statement in question would deceive a substantial number of the group at which the statement is aimed. See *Ragold, Inc.* v. *Ferrero, U.S.A., Inc.* (N.D. Ill. 1980), 506 F. Supp. 117, 125. This can be accomplished by means of a competent survey demonstrating the numbers of the buying public who are deceived. *U-Haul Internatl., Inc.* v. *Jartran, Inc.* (D. Ariz. 1984), 601 F. Supp. 1140, 1149, modified on other grounds (C.A. 9, 1986), 793 F. 2d 1034. In the absence of evidence demonstrating that the statements in question have deceived or have a tendency to deceive a sub-

stantial portion of the target audience, such statements are considered "puffing" and, therefore, not actionable. *Sheldon Friedlich Marketing Corp.* v. *Carol Wright Sales, Inc.* (1982), 217 U.S.P.Q. 896, 900. The court in *Coca Cola Co.* v. *Tropicana Products, Inc.* (S.D.N.Y. 1982), 538 F. Supp. 1091, 1096, reversed on other grounds (C.A. 2, 1982), 690 F. 2d 312, surveyed cases analyzing what is necessary to establish the existence of a tendency to deceive a substantial number of the target audience. In that case, the court noted that injunctive relief has been granted where at least twenty-five percent of the target audience was deceived but never where fifteen percent or less of the target audience was deceived.

The elements of materiality, causation and damages have been much less discussed by the courts in interpreting the Lanham Act. The term "materiality" obviously implies that the statement in question must be a matter of consequence affecting the purchase decision. See, *e.g., Twachtman* v. *Connelly* (C.A. 6, 1939), 106 F. 2d 501, 506 (in an action for fraud, materiality is required). Causation and damages are specifically addressed in R.C. 4165.03 which requires the plaintiff to show that he is "likely to be damaged" by the alleged violation. While this does not require proof of monetary loss, it certainly requires some demonstration of adverse impact on the plaintiff's business by evidence that is "something more than a plaintiff's mere subjective belief that he is injured or likely to be damaged * * *." See, *e.g., Johnson & Johnson* v. *Carter-Wallace, Inc., supra* (631 F. 2d 186), at 189. See, also, *Warren Corp.* v. *Goldwert Textile Sales, Inc.* (S.D.N.Y. 1984), 581 F. Supp. 897, 901; *Sheldon Friedlich Marketing Corp.* v. *Carol Wright Sales, Inc., supra.*

What then, did the evidence demonstrate regarding the probability of the plaintiff prevailing on the merits? The gross dollar volume of Gentry stores in this market since its recent arrival here, and the prior litigation between the parties at the Cleveland Better Business Bureau and before the Federal Trade Commission, along with the testimony and affidavit of Diamond's chief executive officer, provide standing to the plaintiff.

The testimony indicates that both the plaintiff and defendant are appealing to a similar market: individuals between the ages of twenty-five and sixty-five who earn in excess of $25,000, are employed as "professionals" and live in the suburbs. The competition is intense and the acrimony between the parties during the court proceedings emphasized that a commercial Armageddon is in progress.

Norman Diamond, the Chief Executive Officer of the plaintiff, a man who has thirty-nine years of experience in the men's clothing business, testified that in his expert opinion, the defendant has violated the Ohio Deceptive Trade Practices Act by advertising that it sells men's clothing for "about half" the price charged for those same items as "many regular[ly] priced [men's] stores." More specifically, he claims that the defendant has violated R.C. 4165.02(E) and (G) because the products it sells are allegedly of "inferior" quality and are, in fact, "cheaper" than those found in regularly priced department or specialty stores, and that Gentry has violated R.C. 4165.02(J) because it has advertised "fictitious reasons for significantly lower prices."

The court will deal with these complaints in reverse order.

In response to Diamond's complaint that Gentry falsely advertised how it purchased its goods and therefore was giving fictitious reasons for

lower prices, Gentry offered evidence indicating that it uses several purchasing techniques which permit it to purchase at wholesale prices lower than those which the regularly priced stores have to pay. One technique is to agree in advance of the next selling season with its manufacturers that it will purchase over a long period of time the bolt ends. This procedure apparently results in a lower wholesale price to Gentry because it allows the manufacturers to maintain plant capacity and to avoid the need to lay off skilled laborers and shut down their manufacturing facilities due to the natural seasonal demands of the clothing industry.

Gentry also presented evidence that the company's practice is to pay the manufacturers within seven to ten days of delivery, as opposed to an industry average of forty-five to sixty days, which therefore results in lower wholesale costs to Gentry. Similar savings are also accomplished by Gentry's policies of not returning unsold items, not demanding cooperative advertising, and not requiring labels in its clothing.

The evidence does not indicate, at this posture, a probability of plaintiff's prevailing in this regard.

Plaintiff claims that words describing clothing as "luxuriously soft," as being "the real McCoy" or containing "classic detail" will seduce an average consumer into a Gentry store and, therefore, rob Diamond of a potential customer. These quoted terms, and the others mentioned in the ads, are nothing more than puffing. Such boastful assertions and exaggerated descriptions are not false representations which constitute violations of the Deceptive Trade Practices Act.

Regarding the plaintiff's claim that some of the items sold were "inferior" and "cheaper," the testimony of knowledgeable witnesses was con-flicting and not conclusive. The burden upon Diamond to produce evidence that would be of a clear and convincing nature has not been met.

Diamond's major complaint concerns Gentry's continual assertions that consumers will be able to "save about half" or "savings of about 50%" and other slogans of similar import.

The evidence indicates that not everything sold by Gentry was exactly half off, nor were all items available in the Cleveland market. Gentry officials freely admitted that the items sold in its stores ranged in discounts from thirty to seventy percent in comparison to regular-priced stores. Diamond contends that in order for the "about half" slogan to be true, there should be no more than a deviation of five percent permitted. This would, according to Diamond, permit Gentry to sell goods that were at a discount of between forty-five and fifty-five percent. To this, Gentry has responded that, on the whole, and considering all of the savings on all of the items that are for sale in its store, a consumer should be able to save about half. This testimony was corroborated by a survey, albeit self-serving, of items held for sale, and this survey was entered into evidence.

"About" means "nearly"; it also means a "near approximation to that mentioned" and can be given the same effect as "more or less." See *Stevens* v. *McKnight* (1883), 40 Ohio St. 341, 341-342. The concept of the term "about half" has to be taken in the context of the fact that it was contained in an advertisement. If about half is not at a forty-five to fifty-five percent discount, the plaintiff's claimed paramaters, then can the advertising scheme withstand the scrutiny of the Ohio Deceptive Trade Practices Act?

No surveys or probative evidence indicating the effect upon a claimed unsuspecting consumer was presented.

The public may be the subject of some deception, but the actual deception herein occurs when a consumer wears a garment that gives the appearance of high cost, but actually costs less. Unfortunately, the consuming public has become so accustomed to discounting what has been said in ads that any advertising is inevitably and inherently discounted itself. The targeted consuming public is wiser than its most nimble critic and this court still believes in the competency, judgment and the wisdom of our people. The complaining party underevaluates the intelligence of the public and places an inordinate emphasis on the influence of its own and its competitor's press releases. "About half" is about right and is about enough warning to advise the consumer of what he is purchasing.

As George Santayana has said, "Advertising is the modern substitute for argument; its function is to make the worse appear the better."

This is simply a case about an established Cleveland clothier that has lost its market share to a newcomer in the market. It is indeed unusual that this court could spend approximately sixteen hours in trial and thirty hours doing research to determine the factual or illusionary contents of ads that an average individual would read in less than a minute. The parties are also unique in their position in that, given a normal situation, neither would want to have prior restraints on any of its commercial activities.

The public interest is to promote competition which, because of market forces, will result in the delivery of a desirable product at the lowest price to the public. Clothing, unlike major appliances, automobiles and the like, can be fully examined by a shopper of average intelligence before he makes a purchase. "Joker Tags" (those small rectangular cardboard tags on the sleeves of coats) contain an R. N. number which shows who is the actual manufacturer of the product, and an inquisitive consumer can actually do real comparative shopping if he so desires.

This court is not taking the position that the plaintiff's claims are totally unsubstantiated, nor does the court's disposition support a contention that a consumer can save about half when purchasing individual items at Gentry. The "about half" claim is based on an aggregate of goods held for sale and there was not sufficient evidence to demonstrate how this court should order a further disclaimer to the public even though this will be reviewed in future proceedings. The court simply finds that the plaintiff probably cannot demonstrate by clear and convincing evidence that the defendant is violating the Ohio Deceptive Trade Practices Act and, thus, denies plaintiff's claim for a preliminary injunction.

*Preliminary injunction denied.*