[Cite as *Heartland of Urbana OH, L.L.C. v. McHugh Fuller Law Group, P.L.L.C.*, 2016-Ohio-6959.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CHAMPAIGN COUNTY

HEARTLAND OF URBANA OH, LLC : 
:
*Plaintiff-Appellant* : Appellate Case No. 2016-CA-3
:
v. : Trial Court Case No. 2014-CV-210
:
MCHUGH FULLER LAW GROUP, : (Civil Appeal from
PLLC : Common Pleas Court)
:
*Defendant-Appellee* :

. . . . . . . . . . .

# O P I N I O N

Rendered on the 23rd day of September, 2016.

. . . . . . . . . . .

ROBERT M. ANSPACH, Atty. Reg. No. 0017263, J. RANDALL ENGWERT, Atty. Reg. No. 0070746, JOSEPH S. CENTER, Atty. Reg. No. 0092570, 300 Madison Avenue, Suite 1600, Toledo, Ohio 43604
    Attorneys for Plaintiff-Appellant

THOMAS P. MANNION, Atty. Reg. No. 0062551, JUDD R. UHL, Atty. Reg. No. 0071370, MICHELLE L. GORMAN, Atty. Reg. No. 0066493, 1375 East Ninth Street, Suite 1600, Cleveland, Ohio 44114
    Attorneys for Defendant-Appellee

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Plaintiff-Appellant, Heartland of Urbana, LLC ("Heartland"), appeals from a summary judgment rendered in favor of Defendant-Appellee, McHugh Fuller Law Group PLLC ("McHugh"). In support of its appeal, Heartland contends that the trial court erred in holding that its claims for injunctive relief were moot. Heartland further contends that the trial court erred in finding that its claims arising under Ohio's Deceptive Trade Practices Act ("DTPA") failed under the Lanham Act, 15 U.S.C. 1125, and *Diamond Co. v. Gentry Acquisition Corp.*, 48 Ohio Misc.2d 1, 531 N.E.2d 777 (C.P.1988). Finally, Heartland contends that the trial court erred by concluding that Heartland's failure to amend its complaint to request a retraction precluded the court from granting such relief.

{¶ 2} We conclude that the case was not moot. Even if McHugh conceded that it could no longer run the same advertisement due to statutory amendments, Heartland was entitled to have the trial court consider whether McHugh willfully engaged in a deceptive trade practice, and if so, whether Heartland was entitled to attorney fees. Furthermore, the trial court erred in rendering summary judgment in favor of McHugh. The advertisement was literally false under the false by necessary implication doctrine, and in such situations involving comparative advertisements, likely injury is presumed. A rebuttable presumption of causation and injury in fact also arose – which was not rebutted by McHugh in a manner sufficient to warrant summary judgment in its favor.

{¶ 3} Finally, the request for a retraction was sufficiently pled, and the trial court erred in concluding that it was precluded from granting such a remedy. Accordingly, the judgment of the trial court will be reversed, and this cause will be remanded for further

proceedings.

## I. Facts and Course of Proceedings

**{¶ 4}** McHugh is a Mississippi law firm. Michael J. Fuller is an attorney licensed in several jurisdictions, including Mississippi, Georgia, New York, Washington D.C., Kentucky, Ohio, Missouri, Wisconsin, West Virginia, Florida, Pennsylvania, and Tennessee. Fuller is a member/manager of McHugh.

**{¶ 5}** On December 13, 2014, McHugh published a full-page advertisement in the Urbana Daily Citizen newspaper that discussed Heartland, a skilled nursing care facility located in Urbana, Ohio. In addition, the advertisement was published online, on the newspaper's website. The advertisement contained a picture of Heartland's facility in Urbana, and stated:

# ATTENTION!

The government has <u>cited</u>

**HEARTLAND OF URBANA NURSING**

**AND REHABILITATION CENTER**

for failing to provide necessary care and

services to maintain the highest well-being

of each resident.

If you suspect that a loved one was

**NEGLECTED or ABUSED**

at Heartland of Urbana,

call **McHugh Fuller** today!

Has your loved one suffered?

Bedsores

Broken Bones

Unexplained Injuries

**Death**

{¶ 6} The words "Attention," "Neglected or Abused," and "Death," were in bold type and were colored red.   "Cited" was also underlined in red.   In addition, the advertisement contained contact information, including a phone number for McHugh, and a statement that the advertisement was "advertising material."   Michael Fuller's name was also listed on the advertisement.

{¶ 7} After becoming aware of the advertisement, Heartland filed a complaint for injunctive and other relief, along with a request for a temporary restraining order ("TRO"), with the common pleas court on December 24, 2014.   The complaint contained claims for violation of the DTPA, as well as violations of Ohio common law, including claims for defamation and false light invasion of privacy.   Heartland alleged in the complaint that McHugh advertised its services across the country, and that its systematic efforts to entice clients to bring suit against Heartland and other skilled care facilities included a pattern of ongoing newspaper and online advertisements that were false, fraudulent, deceptive, and misleading.

{¶ 8} The complaint further alleged that the language in the advertisement falsely led readers to believe that Heartland had been cited recently.   However, Heartland had not had a citation of any kind for over two years, and had not had a citation remotely

similar to the one alleged in the advertisement since June 24, 2010, more than four years previously. Furthermore, even the June 2010 citation, classified as an "F-309" citation, did not cause harm to any nursing home patient, and the deficiencies had been corrected in June 2010. In all counts of the complaint, as well as the prayer for relief, Heartland asked the trial court for an injunction, attorney fees and costs of the action, and such further relief as the court deemed equitable.

{¶ 9} On December 24, 2014, Heartland also filed a motion for a temporary restraining order ("TRO"). The motion was supported by the affidavit of Heartland's Licensed Nursing Home Administrator, Dan Arnold, who stated that Heartland was an 85-bed, skilled nursing home facility that was ranked overall by the federal government as a "Five Star" nursing home, which is the highest ranking available to nursing homes. Arnold further stated that Heartland had most recently been subject to regular annual surveys on February 20, 2014, and November 23, 2012, during which the Ohio Department of Health had found no deficiencies, and had issued no citations. Consistent with the allegations in the complaint, Arnold additionally stated that the only citation remotely similar to the one referenced in the complaint had occurred more than four years earlier, on the June 24, 2010 survey, and had not resulted in harm to any nursing home patient. The deficiency was also corrected shortly after the June 2010 survey.

{¶ 10} The trial court held an ex parte TRO hearing on December 24, 2014, at which only counsel for Heartland appeared. After hearing Heartland's arguments, the trial court entered a TRO and set a preliminary injunction hearing for January 7, 2015. The restraining order precluded McHugh from using the advertisements in question, and required the ads to be removed from the public domain, including the websites of both

the newspaper and McHugh. On December 31, 2014, Heartland filed a motion seeking a show cause order, because McHugh had not complied with the TRO, and the advertisement remained visible to the public. Heartland then filed a motion for a preliminary and permanent injunction. In the memorandum accompanying the motion, Heartland asked the trial court, among other things, to require McHugh to publish a full-page retraction of its prior advertisement.

{¶ 11} On January 7, 2015, the parties agreed to extend the TRO until the application was heard by a court of competent jurisdiction. On the same day, McHugh filed a notice of removal to federal court. Subsequently, the matter was removed to federal court, but was remanded by the federal court to common pleas court in April 2015, because the amount in controversy required for diversity actions had not been satisfied. Ultimately, in May 2015, the trial court ordered McHugh to file an answer to the complaint.

{¶ 12} In May 2015, McHugh filed a motion asking the trial court to dissolve the TRO. McHugh claimed in the motion that the TRO deprived it of income, because McHugh relied on advertising for its income.[1] However, in June 2015, McHugh withdrew its motion and the parties agreed to continue the TRO until the matter could be set for hearing by a court of competent jurisdiction. Shortly thereafter, the court set the matter for trial in October 2015, and ordered a discovery cut-off of September 30, 2015.

---

[1] The evidence submitted to the trial court indicated that in December 2014, alone, McHugh spent more than $100,000 on advertising in Ohio newspapers and in a newspaper in Huntington, West Virginia. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, Doc. #80, Ex. D. Substantial money appears to be available in litigation against nursing homes. *See, e.g., Manor Care, Inc. v. Douglas,* 234 W.Va. 57, 82-92, 763 S.E.2d 73 (2014) (in case where a decedent's son and estate were represented by McHugh, the West Virginia Supreme Court reversed some parts of the judgment, but affirmed about $5,000,000 in compensatory damages and reduced punitive damages from $80,000,000 to slightly less than $32,000,000).

{¶ 13} On August 3, 2015, McHugh filed a list of its expert and lay witnesses, and included only one lay witness, Michael Fuller. McHugh indicated that Fuller had been involved in the design, creation, and production of the advertisement, and had knowledge about the publicly available information concerning the following matters: citations issued to Heartland that were reviewed and used in creating the advertisement and its content; information that was not used in the advertisement; the target audience of the advertisement; and the response to the advertisement.

{¶ 14} Heartland then attempted to schedule Michael Fuller's deposition. The record clearly indicates that McHugh obstructed access to Fuller by refusing to supply him for a deposition on September 15, 2015, even though the parties had agreed upon the date and location well in advance of the scheduled time for the deposition.

{¶ 15} Moreover, McHugh's explanation to the court for the failure to supply Fuller for the September 15, 2015 deposition was contradicted by the record. Specifically, McHugh filed a motion for a protective order on September 14, 2015, asking the court to stay Fuller's deposition until after McHugh's motion for summary judgment had been resolved.[2] In the motion for protective order, McHugh noted that Fuller's deposition was set for September 15, 2015, and then stated that Fuller had a schedule conflict, based on a mediation set for September 15, 2015, in Mississippi. In this regard, McHugh told the court that: "The date for this mediation has been set since August 10, 2015, well before Defendant's attorneys received notice that Plaintiffs wished to take Mr. Fuller's deposition * * *." Defendant's Motion for a Protective Order, Doc. #51, p. 2.

{¶ 16} Contrary to these representations, the time, date, and location of Fuller's

---

[2] McHugh filed a motion for summary judgment the same day, on September 14, 2015.

deposition had been negotiated and agreed to by both Heartland and McHugh on several occasions between August 21, 2015, and September 10, 2015. *See* Heartland's Memorandum Contra Defendant's Motion for a Protective Order, Doc. #53; Heartland's Motion for A Show Cause Order, Doc. #60; Heartland's Emergency Motion to Compel Fuller's Deposition and for Sanctions, Doc. #61; and the documents attached to these motions.

{¶ 17} Further contrary to its representations to the court, McHugh did not tell Heartland that it needed to cancel the deposition because of the conflict; instead, McHugh indicated on September 9, 2010, that McHugh was filing a motion for summary judgment and believed the resolution of the motion would make the deposition unnecessary.

{¶ 18} In view of the allegations of malice and willfulness in the complaint, Heartland was entitled to question the only fact witness identified by McHugh. McHugh had agreed to produce this witness, and did not have the right to arbitrarily restrict access, particularly after agreeing to produce the witness.

{¶ 19} Instead of ruling on the motion to compel and motion for sanctions for the failure to produce Fuller, the trial court did nothing other than to vacate the discovery deadline.

{¶ 20} As was noted, McHugh's motion for summary judgment was filed on September 14, 2015. On September 24, 2015, Heartland filed a motion under Civ.R. 56(F), asking for an extension of time to respond to the motion. Had the deposition gone forward on September 15, 2015, as agreed, Heartland would not have needed to file a Civ.R. 56(F) motion with the trial court.

{¶ 21} Heartland noted in the motion that Fuller's deposition was critical to its ability

to respond to McHugh's summary judgment motion. However, based on the court's apparent conclusion that the case might be moot, the court denied the Civ.R. 56(F) motion on October 13, 2015, and ordered Heartland to file a response to the summary judgment motion within 21 days. Notably, at the time the summary judgment motion was filed, and even when summary judgment was ultimately granted, the court had not set either a discovery deadline or another trial date.

{¶ 22} After the court denied the Civ.R. 56(F) motion, the parties agreed that Fuller's deposition would be taken on December 16, 2015. The trial court was aware of this, since Heartland filed a notice of deposition. *See* Third Amended Notice of Videotaped Deposition, Doc. #79, filed on October 26, 2015. Heartland also mentioned the deposition and the need to cross-examine Fuller, in its own motion for summary judgment, which was filed on November 3, 2015, and in its November 23, 2015 reply to McHugh's memorandum contra Heartland's summary judgment motion. *See* Plaintiff's Motion for Summary Judgment, Doc. #81, pp. 15, 17, 18, 19, and 19, fn.1, and Heartland's Reply Motion to McHugh's Memorandum Contra Heartland's Summary Judgment Motion, Doc. #83, pp. 4-5. In fact, Heartland indicted that it would supplement its motion and responses to McHugh's motion after Fuller was deposed. *Id.*

{¶ 23} Nonetheless, the court ruled on the summary judgment motions on December 31, 2015, without allowing a reasonable time for Fuller's deposition to be transcribed and filed with the court. (The deposition was filed on January 6, 2016, six days after the court's ruling on summary judgment. The notary's certification on Fuller's deposition indicates the notary did not even finish preparing the deposition until January

5, 2016.)[3]

**{¶ 24}** As an additional matter, McHugh, itself, submitted Fuller's affidavit to buttress its arguments in support of summary judgment. *See* Doc. #82, Defendant's Reply in Support of Its Motion for Summary Judgment; Affidavit of Michael J. Fuller Attached and Motion to Strike Non-Conforming Evidence, filed on November 13, 2015. Thus, McHugh used Fuller to support its motion, but Heartland was not permitted a Civ.R. 56(F) continuance to properly respond to summary judgment.

**{¶ 25}** Finally, on December 23, 2015, McHugh filed a motion for leave to supplement its motion for summary judgment. On December 31, 2015, prior to the expiration of time for Heartland to respond to that motion, the trial court issued its summary judgment decision, granting McHugh's motion for summary judgment, denying Heartland's motion for summary judgment, and dissolving the TRO. Heartland now appeals from the judgment of the trial court.

## II. Did the Court Err in Holding that Heartland's Claims Were Mooted by a Statutory Amendment?

**{¶ 26}** Heartland's First Assignment of Error states that:

The Trial Court Erred in Holding Heartland of Urbana's Claims for Injunctive Relief Were Mooted by R.C. 5165.67.

**{¶ 27}** The gist of Heartland's DTPA claim was that the advertisement was misleading because the only citation remotely similar to the one referenced in the

---

[3] These items were included with the record sent to us, but we have not reviewed the deposition.

advertisement occurred on June 24, 2010, more than four and a half years prior to the date of the advertisement.   According to Heartland, the advertisement deceptively leaves a reader with the perception that the citation was very recent.   Heartland also notes that it had not been issued any citations since 2012, and no citations of the type involved in the 2010 citation had been issued since June 24, 2010.   In addition, Heartland notes that it is a five-star rated facility, which is the highest ranking for a nursing home operating in the United States.

{¶ 28} Heartland also argued in the trial court that the advertisement was deceptive because it omitted a description of the citation (referred to as an F-309 tag), and led readers to believe that the violation was far more serious than it actually was.   For example, under Federal standards applicable to nursing facilities, violations are assessed by letters ranging from "A" to "L," with "L" being the most severe.   "J," "K," or "L" violations mean that a nursing facility is in immediate jeopardy, and is in risk of being cut-off from Medicare reimbursement.   In contrast, the particular violations on June 24, 2010 were only "E" and Level 2 violations, which, at worst, contemplate only minimal physical discomfort and the potential to undermine a given resident's ability to maintain or reach his or her highest practicable well-being, in light of definitions of that resident's plan of care.

{¶ 29} According to Heartland, the harm and injury mentioned in McHugh's advertisement, "negligence, abuse, bedsores, broken bones, unexplained injuries, and death" would fall under a Level 4 severity.   The three matters that were involved in the June 24, 2010 citation, however, involved three relatively minor matters:  a failure to document and administer laxatives prescribed for constipation; a failure to timely

reassess abdominal pain for 18 hours; and a failure to apply prescribed antibiotic for two weeks after a physician had ordered a culture. As a result, these violations would not have caused the type of injury referenced in the advertisement. And again, no harm was caused to any resident by the violations.

{¶ 30} The trial court concluded that Heartland's DTPA claims were mooted by amendments to R.C. 3721.02, which would effectively prohibit further use of the advertisement that ran in the Urbana Daily Citizen on December 13, 2014. *See* Am.Sub.H.B. No. 290 ("H.B. 290"). These statutory amendments were approved on December 19, 2014, and became effective on March 23, 2015.

{¶ 31} On appeal, Heartland indicates that R.C. 5165.67 (which applies to skilled nursing facilities) is the applicable statute, rather than R.C. 3721.02, which applies to residential facilities that provide "accommodations supervision, and personal care services for three to sixteen unrelated adults." R.C. 3721.02(A). As a result, Heartland discusses R.C. 5165.67 in its brief, while McHugh's brief discusses R.C. 3721.02, which was the statute used by the trial court. Both parties agree that these statutes were both amended by H.B. 290, and that they contain the same applicable provisions as pertinent to this case. For ease of discussion, we will refer to R.C. 3721.02, which is the statute considered by the trial court.

{¶ 32} Prior to the H.B. 290 amendments, R.C. 3721.02(F) read as follows:

(F)(1) Except as otherwise provided in this section, the results of an inspection or investigation of a home that is conducted under this section, including any statement of deficiencies and all findings and deficiencies cited in the statement on the basis of the inspection or investigation, shall

be used solely to determine the home's compliance with this chapter or another chapter of the Revised Code in any action or proceeding other than an action commenced under division (I) of section 3721.17 of the Revised Code. Those results of an inspection or investigation, that statement of deficiencies, and the findings and deficiencies cited in that statement shall not be used in any court or in any action or proceeding that is pending in any court and are not admissible in evidence in any action or proceeding unless that action or proceeding is an appeal of an action by the department of health under this chapter or is an action by any department or agency of the state to enforce this chapter or another chapter of the Revised Code.

(2) Nothing in division (F)(1) of this section prohibits the results of an inspection or investigation conducted under this section from being used in a criminal investigation or prosecution.

{¶ 33} Thus, nothing in the prior statute prohibited the use of investigation results in advertising or other matters, or governed their use; the statute simply restricted the use of investigation results in court proceedings.

{¶ 34} After the amendments, R.C. 3721.02(F) read as follows:

(F)(1) Except as otherwise provided in this section, the results of an inspection or investigation of a home that is conducted under this section, including any statement of deficiencies and all findings and deficiencies cited in the statement on the basis of the inspection or investigation, shall be used solely to determine the home's compliance with this chapter or another chapter of the Revised Code in any action or proceeding other than

an action commenced under division (I) of section 3721.17 of the Revised Code. Those results of an inspection or investigation, that statement of deficiencies, and the findings and deficiencies cited in that statement shall not be used in either of the following:

(a) Any court or in any action or proceeding that is pending in any court and are not admissible in evidence in any action or proceeding unless that action or proceeding is an appeal of an action by the department of health under this chapter or is an action by any department or agency of the state to enforce this chapter or another chapter of the Revised Code;

(b) An advertisement, unless the advertisement includes all of the following:

(i) The date the inspection or investigation was conducted;

(ii) A statement that the director of health inspects all homes at least once every fifteen months;

(iii) If a finding or deficiency cited in the statement of deficiencies has been substantially corrected, a statement that the finding or deficiency has been substantially corrected and the date that the finding or deficiency was substantially corrected;

(iv) The number of findings and deficiencies cited in the statement of deficiencies on the basis of the inspection or investigation;

(v) The average number of findings and deficiencies cited in a statement of deficiencies on the basis of an inspection or investigation conducted under this section during the same calendar year as the

inspection or investigation used in the advertisement;

(vi) A statement that the advertisement is neither authorized nor endorsed by the department of health or any other government agency.

(2) Nothing in division (F)(1) of this section prohibits the results of an inspection or investigation conducted under this section from being used in a criminal investigation or prosecution.

**{¶ 35}** The trial court concluded that these amendments would eliminate any false impression about a recent violation, since the date of the citation was now required to be included in advertisements. Furthermore, the amended statute required the number of citations to be included, as well as whether those citations had been substantially remedied. The trial court, therefore, held that the changes in the law had mooted the matter, and rejected Heartland's argument that the court should issue an injunction to prevent future violations. In this regard, the court found that an injunction requiring a defendant to simply follow the law was too broad and vague to be enforceable.

**{¶ 36}** Under the mootness doctrine, " 'American courts will not decide * * * cases in which there is no longer any actual controversy.' " *In re A.G.*, 139 Ohio St.3d 572, 2014-Ohio-2597, 13 N.E.3d 1146, ¶ 37, quoting Black's Law Dictionary 1100 (9th Ed.2009). This is based on the fact that courts have no duty "to decide purely academic or abstract questions." (Citation omitted.) *James A. Keller, Inc. v. Flaherty*, 74 Ohio App.3d 788, 791, 600 N.E.2d 736 (10th Dist.1991). Dismissals on the basis of mootness present questions of law and are reviewed de novo. (Citation omitted.) *Brown v. Dayton*, 2d Dist. Montgomery No. 24900, 2012-Ohio-3493, ¶ 9.

**{¶ 37}** In its brief, Heartland argues that in order for mootness to apply in lawsuits

seeking injunctive relief, the offending conduct must have ceased, and there must be no reasonable expectation that it will continue, with the defendant bearing the burden of proving that there is no reasonable expectation the wrong will be repeated.

{¶ 38} Although the case law Heartland cites is federal, Ohio courts have held that "[a]n action for declaratory and/or injunctive relief, may, however, become moot if the defendant demonstrates that ' * * * "there is no reasonable expectation that the wrong will be repeated." * * * ' " *Ohio Academy of Nursing Homes, Inc. v. Barry*, 10th Dist. Franklin No. 92AP-1266, 1993 WL 186656, *3 (May 25, 1993), quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In *Barry*, the court concluded that issues pertaining to the legality of a reduction in the Medicaid reimbursement rate by a state agency were not rendered moot by the voluntary reinstatement of the original reimbursement rate, because the agency failed to provide evidence of this alleged fact, and additionally, had not provided evidence that the wrongful reductions would not be repeated. *Id.* In *W.T. Grant*, the court stressed that the defendant's burden of showing no reasonable expectation that the wrong would be repeated is a "heavy one." *W.T. Grant* at 633.

{¶ 39} This is consistent with the exception to the mootness doctrine that "arises when the claims raised are capable of repetition, yet evading review. This exception applies when the challenged action is too short in duration to be fully litigated before its cessation or expiration, and there is a reasonable expectation that the same complaining party will be subject to the same action again." (Citation omitted.) *State ex rel. Dispatch Printing Co. v. Louden*, 91 Ohio St.3d 61, 64, 741 N.E.2d 517 (2001). "An injury is not deemed capable of repetition merely because someone, at sometime, [sic] might suffer

the same harm; there must be a reasonable chance that it will happen again to the complaining party." *Village of W. Unity ex rel. Beltz v. Merillat*, 6th Dist. Williams No. WM-03-016, 2004-Ohio-2682, ¶ 16, citing *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975).

{¶ 40} According to the information in the case before us, McHugh voluntarily agreed to stop publishing the advertisement during the litigation. In addition, McHugh submitted an affidavit in connection with its summary judgment motion, conceding that under the law as amended, McHugh would not and could not publish the same advertisement in Ohio, now or in the future. Affidavit of Michael J. Fuller, attached as Ex. A to McHugh's Reply in Support of its Motion for Summary Judgment. Heartland contends that this is insufficient for several reasons. First, Fuller did not sign the affidavit in a representative capacity. Second, an assurance to comply with the law is of no effect.

{¶ 41} We disagree with Heartland's initial proposition. Under Civ.R. 56(C), affidavits are included within the matters to be considered in deciding whether summary judgment is appropriate. Statements of agents or employees of a party opponent are also considered admissions of the party. *See, e.g.*, *Citizens Fed. Bank, F.S.B. v. Brickler*, 114 Ohio App.3d 401, 408, 683 N.E.2d 358 (2d Dist.1996); *Saum v. Venick*, 33 Ohio App.2d 11, 15, 293 N.E.2d 313 (2d Dist.1972) ("answers to the interrogatories propounded to [assistant secretary of defendant] were made under oath and introduced into evidence. They acquire the same status as evidence, as if the statements had been made under oath at the trial and are binding upon [defendant] as admissions against interest or judicial admissions.")

{¶ 42} "Judicial admissions are formal statements, made by a party or a party's

counsel in a judicial proceeding, that act as a substitute for legal evidence at trial. So if a party unequivocally concedes a fact, that concession constitutes a judicial admission for the purposes of trial. Judicial admissions can occur at any point in the litigation process, including the pleading stage." (Footnotes and citations omitted.) *Haney v. Law*, 1st Dist. Hamilton No. C-070313, 2008-Ohio-1843, ¶ 7. " '[A]n admission in a pleading dispenses with proof of the fact admitted and is equivalent to the proof of the fact.' " *Fullum v. Columbiana Cty. Coroner*, 2014-Ohio-5512, 25 N.E.3d 463, ¶ 17 (7th Dist.), quoting *Gerrick v. Gorsuch*, 172 Ohio St. 417, 178 N.E.2d 40 (1961).

**{¶ 43}** Thus, when McHugh submitted Fuller's affidavit, it was a judicial admission of the statements contained in the affidavit, and McHugh could not, thereafter, challenge the fact that McHugh was prohibited from publishing the advertisement it had previously submitted to the Urbana newspaper. As an additional matter, Fuller specifically identified himself in his affidavit as a member/manager of McHugh. Clearly, he was speaking in a representative capacity.

**{¶ 44}** The matters at issue were the publication of the advertisement as well as preventing it from continuing to be published. Heartland indicated from the very beginning of the case that it was not seeking damages, as they would be very difficult to quantify. *See* Transcript of December 24, 2014 TRO Hearing, p. 19.[4] Since relief from publication was obtained, the issue is whether there was any further relief the court could

---

[4] *Compare* McHugh's representations in attempting to prevent remand of a case back to state court. The district court noted that "[i]n its brief opposing remand, McHugh Fuller offered the conclusory assertion that the reputational harm, loss of goodwill, and loss of business opportunities to a skilled nursing facility arising from defamatory advertising 'clear[ly]' is in excess of $75,000. (Doc. 7 at PageID 243.)" *Heartland of Portsmouth, OH, LLC v. McHugh Fuller Law Group, PLLC*, S.D.Ohio No. 1:15-CV-007, 2015 WL 728311, *3 (Feb. 19, 2015).

order that would prevent application of the mootness doctrine.

{¶ 45} R.C. 4165.02 outlines various deceptive trade practices, and, as pertinent to the claims Heartland says it is making, states that:

(A) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:

* * *

(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

* * *

(7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

* * *

(9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(10) Disparages the goods, services, or business of another by false representation of fact * * *.

{¶ 46} R.C. 4165.03 allows two avenues for suit.   First, the statute provides that:

(A)(1) A person who is likely to be damaged by a person who commits a deceptive trade practice that is listed in division (A) of section 4165.02 of the Revised Code may commence a civil action for injunctive relief against the other person, and the court of common pleas involved in that action may grant injunctive relief based on the principles of equity and on the terms that the court considers reasonable. *Proof of monetary damage or loss of profits is not required* in a civil action commenced under division (A)(1) of this section.

(Emphasis added.)

{¶ 47} R.C. 4165.03(A)(2) also provides for a civil action to be brought by persons who have been injured by persons injured by a deceptive trade practice listed in R.C. 4165.02(A). With respect to the two kinds of civil actions authorized by R.C. 4165.03(A), R.C. 4165.03(B) states that:

The court may award in accordance with this division reasonable attorney's fees to the prevailing party in either type of civil action authorized by division (A) of this section. An award of attorney's fees may be assessed against a plaintiff if the court finds that the plaintiff knew the action to be groundless. An award of attorney's fees may be assessed against a defendant if the court finds that the defendant has willfully engaged in a trade practice listed in division (A) of section 4165.02 of the Revised Code knowing it to be deceptive.

{¶ 48} Heartland sought injunctive relief and attorney fees in the complaint, and with respect to these issues, the case was not moot. Instead of deciding the issues in

the case, i.e., whether McHugh had committed a deceptive trade practice, and, if so, whether McHugh did so willfully, which would allow Heartland to obtain attorney fees, the court concluded that the case was moot since McHugh had withdrawn the advertisement and indicated that it could not statutorily run the same advertisement in the future. However, by doing so, the court disregarded McHugh's past conduct, and the issue of whether that conduct, if established as a willful violation of the DTPA, would entitle Heartland to attorney fees.

{¶ 49} The statute clearly states that attorney fees may be granted under either type of action brought under R.C. 4165.03(A), i.e., an action where a person is likely to be damaged and seeks injunctive relief, or an action where a person has been injured and seeks damages. Heartland's situation falls within the first category, and it was not necessary for Heartland to establish actual damages in order to recover attorney fees. The trial court should have decided the issue of whether McHugh had willfully committed a deceptive trade practice, and, if so, whether Heartland was entitled to attorney fees because it was required to bring an action for an injunction. This issue was contested. Specifically, even though Fuller's affidavit conceded that the ad could no longer be used in its current form in light of the statutory changes, Fuller nonetheless expressed the view that the advertisement was not false or deceptive. *See* Affidavit of Michael J. Fuller, attached to Doc. #82 as Ex. A, p. 2, ¶ 7.

{¶ 50} Ohio does not have a significant amount of case law relating to the DTPA. As a result, "where claims are made under Ohio common law and the deceptive trade practices statutes, courts are to apply essentially the same analysis as that applied in assessing unfair competition under the federal statutes." (Citation omitted.) *Cesare v.*

*Work*, 36 Ohio App.3d 26, 28, 520 N.E.2d 586 (9th Dist.1987). *Accord Leventhal & Assoc., Inc. v. Thomson Cent. Ohio*, 128 Ohio App.3d 188, 196, 714 N.E.2d 418 (10th Dist.1998).

{¶ 51} In *Cesare*, the court concluded that the plaintiff was entitled to a permanent injunction because he successfully demonstrated a "likelihood of confusion" over whether customers purchased tickets to one band's performance, thinking they were going to see another band. However, because the plaintiff had not demonstrated that he had been injured, he was not entitled to actual damages. *Cesare* at 28.

{¶ 52} Notably, in *Cesare*, the trial court awarded the plaintiff attorney fees as the "prevailing party," and the court of appeals agreed that there was sufficient evidence for the trial court to make an award of reasonable attorney fees. *Id*. at 29. This occurred even though the plaintiff obtained only injunctive relief.

{¶ 53} Based on the preceding discussion, the trial court erred in concluding that the case was moot. Even if McHugh conceded that it would no longer run the same advertisement, Heartland was entitled to have the court consider whether McHugh willfully committed a deceptive trade practice, and, if so, whether Heartland was entitled to attorney fees. Accordingly, the First Assignment of Error is sustained. However, whether this error is prejudicial depends on our resolution of the Second Assignment of Error. Specifically, the trial court alternatively rendered summary judgment on Heartland's claim under the DTPA. If the trial court was correct in granting summary judgment, any error in finding the case moot would be harmless.

## III. Did Heartland's Claim under the DTPA Fail?

{¶ 54} Heartland's Second Assignment of Error states that:

The Trial Court Erred by Holding Heartland of Urbana's Claim Arising Under the Deceptive Trade Practices Act Fails Pursuant to *Diamond Co. v. Gentry Acquisition Corp.* and the Lanham Act.

{¶ 55} In its brief, Heartland combines its discussion of the First and Second Assignment of Error. However, the basic arguments being made under the Second Assignment of Error are, first, that the trial court's comments *about Diamond Co. v. Gentry Acquisition Corp.*, 48 Ohio Misc.2d 1, 531 N.E.2d 777 (C.P.1988), are dicta, and second, that the trial court failed to recognize that Heartland's claim under the DTPA involves several branches, rather than just a "false advertising" claim as discussed in *Diamond Co.* In this context, Heartland relies on the enumerated deceptive trade practices in R.C. 4165.02(A)(2), (3), (7), (9), and (10).

{¶ 56} Finally, Heartland contends that the test outlined in *Diamond Co.* conflicts with the DTPA. Specifically, according to Heartland, *Diamond Co.* requires demonstration of some adverse impact other than a plaintiff's subjective belief that he or she is injured or likely to be injured. Heartland contends this standard imposes too heavy a burden.

{¶ 57} After finding the claims moot, the trial court went on to note that even if the case were not moot, McHugh would be entitled to summary judgment on the DTPA claim. In this regard, the court reasoned that Heartland failed, under the test set out in *Diamond Co.*, to demonstrate any causal connection between the allegedly false statements and any harm resulting to Heartland. If the case, indeed, were moot, the trial court's comments about summary judgment would have been dicta. However, since the trial

court erred in concluding that the case was moot, we must consider the summary judgment ruling.

**{¶ 58}** Concerning summary judgment, "[a] trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor."  (Citation omitted.)  *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999).  "We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court."  (Citations omitted.)  *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.).

**{¶ 59}** As was noted earlier, Ohio courts look to case law interpreting the Lanham Act for guidance when considering the DTPA.  *See, e.g., Dawson v. Blockbuster, Inc.*, 8th Dist. Cuyahoga No. 86451, 2006-Ohio-1240, ¶ 23 (noting that "[t]he Ohio Deceptive Trade Practices Act is substantially similar to the federal Lanham Act * * * .")

**{¶ 60}** Section 43(a) of the Lanham Act, 15 U.S.C. 1125, prohibits both false advertising and unfair competition.  *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 646 (6th Cir.1982), citing *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702 (5th Cir. 1981).  In this regard, " 'the essential misrepresentation in "false advertising," which* * * forms the basis of the "false representation" leg of § 43(a), is fundamentally different from the essential misrepresentation in "unfair competition": in the former case, the defendant makes no

secret of the origin of the goods in himself, but merely misrepresents certain qualities or characteristics that his goods may or may not have; in the latter case, the defendant misrepresents his goods to be those of another.' "  *Id.*, quoting *Chevron* at 701.

**{¶ 61}** 15 U.S.C. 1125(a)(1) refers to both goods and services, and prohibits any person from making "false or misleading representations of fact, which * * * misrepresents the nature, characteristics, qualities, or geographic representations of his or her or another person's goods, *services, or commercial activities * * *.*"  (Emphasis added.) Thus, the statute is not simply limited to false representations of one's own goods; it includes services and false representations about another's services and commercial activities.  However, the distinction in *Frisch's* between false advertising and unfair competition is still pertinent.

**{¶ 62}** "Two different theories of recovery are available to a plaintiff who brings a false advertising action under § 43(a) of the Lanham Act.  First, the plaintiff can demonstrate that the challenged advertisement is literally false, i.e., false on its face." (Citation omitted.)  *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir.2007).  "When an advertisement is shown to be literally or facially false, consumer deception is presumed, and 'the court may grant relief without reference to the advertisement's [actual] impact on the buying public.' "  *Id.*, quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir.1982), *abrogated on other grounds by* Fed.R.Civ.P. 52(a).  Under the second theory, "a plaintiff can show that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." (Citation omitted.)  *Id.*  Regarding this second theory, the claim is that a statement, while literally true, leaves an impression on consumers that conflicts with

reality. *Id.* In situations involving the second theory, courts " '*must* rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message.' " (Emphasis sic.) *Id.*, quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir.1999).

{¶ 63} In *Time Warner*, the plaintiff proceeded strictly on a literal falsity claim. One commercial was found to contain a literally false statement, and the court of appeals affirmed a preliminary injunction that had been granted based on a presumption of irreparable harm. *Time Warner* at 152 and 154. In discussing a second commercial, in which the statements were not "literally false," the court concluded that it would formally adopt a doctrine "known in other circuits as the 'false by necessary implication' doctrine." *Id.* at 158, citing cases from the First, Third, Fourth, and Ninth Circuits.[5] The court noted that:

> Under this doctrine, a district court evaluating whether an advertisement is literally false "must analyze the message conveyed in full context," [*Castrol v.*] *Pennzoil Co.*, 987 F.2d [939] at 946 [(3d Cir.1993)], i.e., it "must consider the advertisement in its entirety and not ... engage in disputatious dissection," *Avis Rent A Car* [*System, Inc. v. Hertz Corp.*], 782 F.2d [381] at 385 [(2d Cir.1986)] (internal quotation marks omitted). If the words or images, considered in context, necessarily imply a false message,

---

[5] The doctrine has been adopted by other federal appellate districts as well. *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 240 (5th Cir.2014) (noting adoption by the First, Second, Third, Fourth, Ninth, and Federal Circuit Courts). It has also been applied by district courts in other circuits, including the Sixth Circuit. *See, e.g., Cboss, Inc. v. Zerbonia*, N.D.Ohio No. 409CV00168, 2010 WL 3835092, *6 (Sept. 29, 2010); *Fed. Exp. Corp. v. United Parcel Serv., Inc.*, 765 F.Supp.2d 1011, 1022 (W.D.Tenn.2010); *MSP Corp. v. Westech Instruments, Inc.*, 500 F.Supp.2d 1198, 1216-1217 (D.Minn.2007).

the advertisement is literally false and no extrinsic evidence of consumer confusion is required.

*Time Warner*, 497 F.3d at 158.

**{¶ 64}** The court stressed that if the language or graphic in the advertisement "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." (Citation omitted.) *Id.* In such situations, factfinders " 'might conclude that the message conveyed by a particular advertisement remains so balanced between several plausible meanings that the claim made by the advertisement is too uncertain to serve as the basis of a literal falsity claim * * *.' " *Id.*, quoting *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir.2000). *Accord Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir.2016).

**{¶ 65}** The rationale for the presumption of harm is that the injury in misleading, non-comparative commercials "accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other." *McNeilab, Inc. v. Am. Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988). As a result, in such situations, "some indication of actual injury and causation" is required to ensure that a plaintiff's injury is not speculative. *Id.* In contrast, "[a] misleading comparison to a specific product necessarily diminishes that product's value in the minds of the consumer." *Id.* "This is analogous to a Lanham Act trademark dispute. An infringing mark, by its nature, detracts from the value of the mark with which it is confused * * * [and] irreparable harm will be presumed." *Id. Accord Time Warner* at 162. The same observations are equally applicable to disparagement of services of a specific provider, like Heartland.

**{¶ 66}** After reviewing the second advertisement under these standards, the court

of appeals in *Time Warner* affirmed the district court's conclusion that Time Warner had established a likelihood of success on its claim that the advertisement was literally false. *Time Warner*, 497 F.3d at 158.

{¶ 67} In *Diamond Co.*, the Common Pleas Court of Cuyahoga County referred to federal law, and stated that:

The generally required proofs on a claim of false or deceptive advertising are:

(a) a false statement, or a statement which is misleading;

(b) which statement has actually deceived or has the tendency to deceive a substantial segment of the target audience;

(c) the deception is material in that it is likely to influence a purchasing decision; and

(d) The plaintiff has been or is likely to be injured as a result.

*Diamond Co.*, 48 Ohio Misc.2d at 5, 531 N.E.2d 777, citing *Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F.Supp. 1411, 1419 (E.D.N.C.1986). (Other citation omitted.)

{¶ 68} Consistent with *Time Warner*, the court noted in *Diamond Co.* that "[i]f a statement in an advertisement is facially false or is susceptible to an objective determination of its falsity, the only issues under the Lanham Act are questions of materiality, causation and damages. * * * If the challenged statement is not objectively or facially false, the plaintiff then has the burden of introducing some evidence that the statement in question would deceive a substantial number of the group at which the statement is aimed." (Citations omitted.) *Id.* at 5-6.

{¶ 69} In *Diamond Co.*, the court also discussed materiality, causation, and damages. *Id.* at 6. As relevant here, the court noted that R.C. 4165.03 requires a plaintiff to show that he or she is " 'likely to be damaged' by the alleged violation." *Id.* The court stressed that "[w]hile this does not require proof of monetary loss, it certainly requires some demonstration of adverse impact on the plaintiff's business by evidence that is 'something more than a plaintiff's mere subjective belief that he is injured or likely to be damaged.' " *Id.*, quoting *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir.1980).

{¶ 70} In *Johnson* (the case cited by *Diamond Co.*), the court of appeals reversed the dismissal of the plaintiff's claims after a bench trial. The dismissal had been based on the plaintiff's failure to carry its burden to show damage or likelihood of damage. *Johnson* at 189.

{¶ 71} The case involved Johnson's claims that the defendant, Carter-Wallace, made false claims for its product (NAIR with baby oil), and that Carter was "packaging and advertising NAIR so as to give consumers the false impression that NAIR is a Johnson & Johnson product." *Id.* at 188. Johnson promoted its own product, baby oil, "as a substitute for shaving cream and is used for removal of hair by shaving." *Id.* at 190. The court of appeals noted that "Johnson's false representation claim alleges that Carter's 'NAIR with baby oil' campaign falsely represents to consumers that the baby oil in NAIR has moisturizing and softening effect on the skin of the user." *Id.* at 188. After reviewing the evidence, the court of appeals found that Johnson had provided sufficient evidence to support its claim, and reversed the dismissal of the case.

{¶ 72} In *Johnson*, the court of appeals rejected the district court's conclusion that

Johnson must show that Carter caused some injury in order to obtain an injunction. *Id.* at 190. The court stressed that "[t]he statute demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising. The correct standard is whether it is likely that Carter's advertising has caused or will cause a loss of Johnson sales, not whether Johnson has come forward with specific evidence that Carter's ads actually resulted in some definite loss of sales." *Id.* The court went on to stress that "[c]ontrary to Johnson's argument, however, the likelihood of injury and causation will not be presumed, but must be demonstrated. If such a showing is made, the plaintiff will have established a reasonable belief that he is likely to be damaged within the meaning of § 43(a) and will be entitled to injunctive relief, as distinguished from damages, which would require more proof." *Id.*

{¶ 73} Unlike *Time Warner* and *McNeilab*, however, *Johnson* involved a non-comparative advertisement, rather than a specific comparison of the parties. *See McNeilab*, 848 F.2d at 38. Likewise, *Diamond Co.* involved a non-comparative commercial, in which the competitor's name was not mentioned. *See Diamond Co.*, 48 Ohio Misc.2d at 4, 531 N.E.2d 777 (the defendant's ads referred to "regular-priced stores and departments," and not to any competitor by name).

{¶ 74} In *McNeilab*, the court stressed that:

Both *Coca-Cola* [*v. Tropicana Prods., Inc.*, 690 F.2d 312 (2d Cir.1982),] and *Johnson & Johnson* [*v. Carter-Wallace, Inc.*, 631 F.2d 186, (2d Cir.1980)] involved misleading, non-comparative commercials which touted the benefits of the product advertised but made no direct reference to any competitor's product. The injury in such cases accrues equally to

all competitors; none is more likely to suffer from the offending broadcasts than any other. The Lanham Act, however, only authorizes actions by one "who believes that he is or is likely to be damaged." 15 U.S.C. § 1125(a). Thus, we required some indication of actual injury and causation to satisfy Lanham Act standing requirements and to ensure a plaintiff's injury was not speculative. *See Johnson & Johnson*, 631 F.2d at 189. This case, by contrast, presents a false comparative advertising claim. Thus, the concerns voiced in *Coca-Cola* and *Johnson & Johnson* regarding speculative injury do not arise. A misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer.

*McNeilab* at 38. *See also Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 259 (2d Cir.2014). Accordingly, neither *Diamond Co.* nor *Johnson* is pertinent or controlling in the case before us, where the advertisement in question refers directly to the plaintiff. The appropriate standard is taken from decisions like *McNeilab*, *Time Warner*, and *Merck*, which discuss misleading advertisements identifying a specific party.

{¶ 75} Furthermore, "[a] predicate finding of intentional deception, as a major part of the defendant's marketing efforts, *contained in comparative advertising*, encompasses sufficient harm to justify a rebuttable presumption of causation and injury in fact." (Emphasis sic.) *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir.1997). *Accord Merck* at 260.

{¶ 76} After applying the above standards to the case before us, which involves comparative advertising (identifying the specific party), we conclude that McHugh's ad is

literally false pursuant to the false by necessary implication doctrine. Although the statement that Heartland had been cited is not literally false, the words, "considered in context, necessarily imply a false message * * *." *Time Warner*, 497 F.3d at 158.

**{¶ 77}** When the advertisement was published, McHugh, a law firm, would have known that any claims based on the June 24, 2010 citations were barred due to the statute of limitations – one year for medical claims pursuant to R.C. 2305.113(A), or two years for bodily injury pursuant to R.C. 2305.10. *See, e.g., Conkin v. CHS-Ohio Valley, Inc.*, 1st Dist. Hamilton No. C-110660, 2012-Ohio-2816, ¶ 5-13 [discussing distinction between "medical claims" against nursing homes that arise from care, medical diagnosis and treatment of a resident, versus claims that arise from negligence, like injury to a resident during transport. The latter claims would not be barred by the one-year limitation period in R.C. 2305.113(A)]. *Accord Haskins v. 7112 Columbia, Inc.*, 2014-Ohio-4154, 20 N.E.3d 287, ¶ 2 and 5 (7th Dist.) (two year statute of limitations for negligence applies to action brought against nursing home, where resident's leg was broken when her bed was being changed). McHugh would also have had access to information that Heartland had not been cited in 2012 or 2014, and that none of the citations related to harm caused to residents.

**{¶ 78}** Furthermore, the only reasonable conclusion is that the advertisement falsely implied Heartland was a facility where patients were being exposed to very dangerous conditions, including death, and that McHugh made impliedly false statements intended to deceive customers. As a result, Heartland's services were necessarily diminished in the minds of consumers, since Heartland was directly identified. *McNeilab*, 848 F.2d at 38. Furthermore, in view of the intentional deception, a rebuttable

presumption of causation and injury in fact arose – which was not rebutted by McHugh. *Merck*, 760 F3d at 261. Because McHugh failed to submit evidence to rebut these presumptions – or to rebut the presumption that Heartland's services were diminished in the minds of consumers, the trial court erred in rendering summary judgment in favor of McHugh.

**{¶ 79}** In *Internatl. Diamond Exchange Jewelers, Inc. v. U.S. Diamond & Gold Jewelers, Inc.*, 70 Ohio App.3d 667, 591 N.E.2d 881 (2d Dist.1991), we found the opinion in *Diamond Co.* "well-reasoned," and adopted it. *Id.* at 676. However, although our own case involved specific reference to a competitor, we did not consider the distinctions between non-comparative advertising and advertising identifying specific competitors. This may be because the parties did not bring the distinction to our attention. In addition, the doctrine was not as well-known at the time. For example, the Second Circuit only formally adopted it in 2007. *Time Warner*, 497 F.3d at 158. As a result, our decision is not a full consideration of the matter.

**{¶ 80}** Nonetheless, *Internatl. Diamond* is not controlling because it dealt only with the issue of whether a grant of a preliminary injunction should be stayed pending the outcome of a permanent injunction hearing, and not with a judgment on the merits of the case. *Id.* at 669. Also, in contrast to the case before us, we concluded in *Internatl. Diamond* that the comments in the advertisement were not misleading, but were fair comment, and that the plaintiff was unlikely to prevail on the merits. *Id.* at 677.

**{¶ 81}** Heartland's final point is that the trial court failed to consider its five separate claims under the DTPA. At pages 10-11 of its brief, Heartland discusses how the content of the advertisement qualifies as a deceptive trade practice under each prong. For

example, Heartland states that the advertisement is deceptive under R.C. 4165.02(A)(2) and (A)(3) because it causes a likelihood of confusion concerning the government's approval and certification of Heartland's services. We need not address this argument, however, because we have already concluded that the trial court erred in granting summary judgment in favor of McHugh.

{¶ 82} Based on the preceding discussion, the Second Assignment of Error is sustained.

IV. Failure to Grant a Mandatory Injunction

{¶ 83} Heartland's Third Assignment of Error states that:

The Trial Court Erred by Finding Heartland of Urbana's Failure to Amend Its Complaint to "Add a Request for a Mandatory Injunction, in the Form of a Retraction" Precluded the Court From Granting Such Relief.

{¶ 84} Under this assignment of error, Heartland contends that the trial court erred in concluding that it could not grant a "mandatory injunction" because Heartland failed to add a request for this form of relief in its complaint. Heartland argues that it generally asked for injunctive relief in the complaint, and that the allegations in the complaint were sufficient to be construed as a request for retrospective relief in the form of a retraction of the advertisement.

{¶ 85} Civ.R. 8(A) provides that "[a] pleading that sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled." Civ.R. 8(F)

further states that "[a]ll pleadings shall be so construed as to do substantial justice."

{¶ 86} In the complaint, Heartland asked the trial court for an injunction and such further equitable relief as the court deemed appropriate. Additionally, Heartland filed a motion for a preliminary and permanent injunction, and asked the trial court in its memorandum to require McHugh to publish a full-page retraction of its prior advertisement.

{¶ 87} "A prohibitory injunction preserves the status quo by enjoining a defendant from performing the challenged acts in the future. * * * A mandatory injunction, however, is an extraordinary remedy that compels the defendant to restore a party's rights through an affirmative action. * * * The distinction between these two categories of injunctive relief can best be summed up as follows: a prohibitory injunction is used to prevent a future injury, but a mandatory injunction is used to remedy past injuries." (Citations omitted.) *State ex rel. Gen. Motors Corp. v. Indus. Comm.*, 117 Ohio St.3d 480, 2008-Ohio-1593, 884 N.E.2d 1075, ¶ 12. For example, in *Gratz v. Lake Erie & W. RR. Co.*, 76 Ohio St. 230, 233, 81 N.E. 239 (1907), a railroad attempted to obtain a mandatory injunction for a property owner to remove a crossing he had constructed over the railroad.

{¶ 88} Similarly, we noted that "a mandatory injunction is a proper remedy for an adjoining landowner to seek for the purpose of compelling the removal of an encroachment." *Miller v. W. Carrollton*, 91 Ohio App.3d 291, 296, 632 N.E.2d 582 (2d Dist.1993). In *Miller*, we observed that mandatory injunctions have a "drastic character" and courts should "consider and weigh the relative conveniences and comparative injuries to the parties which would result * * *." *Id.* In light of this standard, we concluded that the trial court had erred in issuing a mandatory injunction requiring parts of a car

wash encroaching on the right of way to be torn down. Instead, we modified the injunction to provide that the city should regulate traffic on the street by prohibiting any parking or vehicles standing on the street, which would eliminate any inconvenience to adjoining property owners. *Id.* at 300.

**{¶ 89}** Publishing a retraction of an advertisement in a newspaper does not appear to qualify as the type of remedy that has the "drastic character" of a mandatory injunction. Instead, it appears to be the type of equitable relief that a court could easily order where money damages are not being sought.

**{¶ 90}** "The function of equitable relief is to supplement the law where the law is insufficient to remedy a wrong." *Barone v. Barone*, 11th Dist. Geauga No. 2004-G-2575, 2005-Ohio-4479, ¶ 17, citing *Mosesson v. Rach*, 7th Dist. Mahoning No. 99 CA 321, 2001 WL 315236, *2, fn.1 (Mar. 28, 2001). "In short, a court's equitable powers may be invoked to provide the flexibility necessary to moderate unjust results." *Id.* "Under the prayer for general equitable relief, the Court may grant any relief that is consistent with the pleadings and the evidence." (Citations omitted.) *Suburban Home Mortg. Co. v. Hopwood*, 83 Ohio App. 115, 123-24, 81 N.E.2d 387 (2d Dist.1948).

**{¶ 91}** Under the circumstances, we conclude that a request for retraction of the advertisement was sufficiently pled, and that the trial court erred in concluding otherwise. Accordingly, the Third Assignment of Error is sustained.

## V. Conclusion

**{¶ 92}** All of Heartland's assignments of error having been sustained, the judgment of the trial court is reversed, and this cause is remanded for further proceedings.

. . . . . . . . . . . .

DONOVAN, P.J., concurs.

HALL, J., concurring:

{¶ 93} I agree with the well-reasoned lead opinion and join wholeheartedly. I write separately only to note that appellant's argument that there are five possible violations of the DTPA being R.C. 4165.02 (A) subsections (2),(3),(7),(9) and (10), in my view may be overly broad. The first four subsections they refer to involve advertisement misrepresentations by a company about THEIR OWN products or services, not disparagement of someone else's products or services. In other words, to violate the first four sections referenced, one must misrepresent its own product or service. An example is in *Diamond Co. v. Gentry*, *supra*. Diamond was complaining about Gentry's representations about Gentry's own clothing line (although there were comparisons to "regular-priced stores [and] Elsewhere.") That claimed misrepresentation of defendant-Gentry's own products could be a violation by the advertiser. But here, the law firm is not touting the qualities of their own services, they are being critical of another's. In my view that is likely to fall exclusively under RC 4165.02(A)(10), "Disparaging the goods, services, or business of another." However, at this summary judgment stage of proceedings I am not prepared to say that there is no genuine issue of material fact with regard to the other subsections.

. . . . . . . . . . . .

Copies mailed to:

Robert M. Anspach
J. Randall Engwert
Joseph S. Center
Thomas P. Mannion
Judd R. Uhl
Michelle L. Gorman
Hon. Nick A. Selvaggio